[No. B154724. Second Dist., Div. One. June 25, 2003.]

JOHN T. BARNARD et al., Plaintiffs, Cross-defendants and Appellants, v. MAJOR A. LANGER et al., Defendants, Cross-complainants and Respondents.

1454

## COUNSEL

John T. Barnard, in pro. per., for Plaintiffs, Cross-defendants and Appellants.

Perona, Langer, Beck, Lallande & Serbin, Ronald Beck; Baker, Keener & Nahra, Robert C. Baker and E. Todd Trumper for Defendants, Cross-complainants and Respondents.

## OPINION

**VOGEL (MIRIAM A.), J.**—This is a legal malpractice action in which the plaintiffs claimed their former lawyers settled the underlying inverse condemnation case for too little money, and the lawyers (by cross-complaint) sought the fee they earned in the underlying case. The trial court disposed of the plaintiffs' claim by nonsuit on the ground that, assuming negligence, the plaintiffs' damages were too speculative, then gave judgment to the lawyers on their cross-complaint. The plaintiffs appeal, claiming the lawyers were not entitled to their fee and that the trial court should not have granted nonsuit. We affirm and grant the lawyers' motion for sanctions for a frivolous appeal.

### FACTS

#### A.

A public sewer maintained by the City of Los Angeles runs under property owned by John T. Barnard (and his wife, Virginia I. Barnard, who is included in our references to Barnard except where the context makes it clear we are referring only to him).[1] In August 1993, the City discovered the sewer had deteriorated and caused Barnard's property to subside. In November 1995, Barnard retained the law firm of Perona, Langer, Beck & Lallande to pursue an inverse condemnation action against the City, agreed in writing to pay all costs "as incurred," and agreed to pay the Perona firm 22.5 percent of "any benefits conferred and/or any settlement or judgment." The inverse condemnation action was filed in January 1996.

The Perona firm retained engineers to determine the scope and cost of repairs required for Barnard's property, and retained a real estate appraiser

---

[1]Barnard is a lawyer, licensed to practice in California since 1963, who formerly worked as a deputy city attorney in the condemnation section of the Los Angeles City Attorney's Office. As will appear, he was actively involved in the underlying condemnation action and ultimately associated in as cocounsel with the Perona firm. Barnard is representing himself (and his wife) on this appeal.

(Michael Camras) to value the property. Camras initially valued the property, in an undamaged condition, at $745,000 but later reduced his valuation to $730,000.[2] The City's appraiser valued the property at $681,000, but later reduced his valuation to $626,000. Barnard's engineers said the cost of repairs would be about $565,000; the City said the cost would be only $177,000.

In July 1997, the City offered to settle for $175,000, plus attorney's fees and costs. Barnard rejected the offer. In November, the City offered to purchase Barnard's property for $715,000 and to pay Barnard's attorney's fees and costs. Barnard rejected the offer. About a week or two later, one of the two lawyers at the Perona firm primarily responsible for Barnard's lawsuit against the City (Ellen R. Serbin) told Barnard his engineers were revising their repair estimates upward, and the estimated cost of repair was later increased from $565,000 to $757,000.[3]

In December, Barnard reached a short-lived settlement with the City. Subject to the City Council's approval, the City agreed (1) to purchase the property for $745,000, (2) to rent it back to Barnard for three years at $1,000 per month (well below market value), (3) to pay Barnard an additional $150,000 for interest, inconvenience, and the like, and (4) to pay Barnard's attorney's fees and costs. The all-cash deal totaled about $1.1 million. The City Council approved the settlement and the City deposited the funds in an escrow account, but Barnard attempted to revise the deal, made new demands, and ultimately refused to go through with the deal. The Perona firm prepared for trial.

In April 1998, Barnard asked Major Langer (the other primarily responsible Perona lawyer) to reduce the firm's fee by $100,000. Barnard ignored his own additional demands after the December 1997 settlement was made and claimed the settlement was unduly delayed and had fallen apart because the Perona firm should have negotiated a higher settlement amount to include prejudgment interest.[4] Barnard pressed for continued settlement

---

[2]There is no dispute about the valuation date or the methods of valuation (unencumbered fair market value), and thus no need to discuss those issues.

[3]Barnard claims he was never told about the amount of the increased estimate for repairs, and this claimed omission forms one basis for his subsequent allegation that the Perona firm was negligent.

[4]Barnard's claim that he would have been entitled to prejudgment interest forms the basis of another of his allegations in his legal malpractice action. (See Code Civ. Proc., § 1268.310 [in an eminent domain action, the compensation awarded shall draw interest from the earliest of (a) the date of entry of judgment; (b) the date the governmental entity takes possession of the property; (c) the date after which the entity is authorized to take possession]; § 1268.311 [in an inverse condemnation proceeding "in which interest is awarded," the interest shall be

discussions and asked the Perona firm to negotiate a deal in which he "would keep [his] home and be paid damages for its loss of value."[5]

With a settlement meeting set for April 29, Barnard told the Perona firm on April 28 that he wanted to associate in as cocounsel because he had "concluded that it would facilitate the closure of th[e] matter if [he] could talk directly to the City Attorney's Office" (and the association was formalized two days later). At the April 29 meeting, Barnard proposed a deal where he would keep the property and the City would pay him $750,000 plus his attorney's fees and costs. The City rejected the offer. On May 5, Barnard met alone (and without invitation to anyone at the Perona firm) with the City's lawyer and repeated the same demand he had made on April 29. The City again rejected the offer. There were further settlement discussions on May 18 but no settlement was reached. Meanwhile, expert depositions were scheduled and the Perona firm prepared for trial.

On June 8 (with a mandatory settlement conference set for June 9), Barnard sent another demand to the City but did not tell anyone at the Perona firm what he was doing, and did not send the firm a copy of his letter to the City. In this demand, Barnard valued his property at $200,000 "as is" (in its damaged condition) and demanded more than $900,000 to settle the case.

At the June 9 settlement conference, the City rejected Barnard's demand but offered to settle for $850,000 (including attorney's fees and costs), with Barnard keeping the property, and the City's all-cash offer (the December 1997 deal) remained open. Barnard asked the Perona firm "to contribute to the settlement" by reducing its fee by $100,000.[6] The firm refused. Barnard then accepted the City's $850,000 offer which, after deducting fees and costs, meant Barnard received $680,000 and kept his property. The settlement was placed on the record.

---

computed as prescribed by § 1268.350]; § 1268.330 [if the owner continues in actual possession of the property after the date interest begins to accrue, the value of that possession shall be offset against the interest]; *People ex rel. Dept. of Transportation v. Gardella Square* (1988) 200 Cal.App.3d 559, 571, 574 [246 Cal.Rptr. 139].) The problem with Barnard's allegation is that he knew, by reason of his own research (and his later consultation with another condemnation lawyer) that he had a claim for prejudgment interest, and the Perona firm did not suggest otherwise. There is also the fact that interest was specifically included in the December 1997 settlement from which Barnard withdrew. Undesignated section references are to the Code of Civil Procedure.

[5]Barnard was having serious financial problems. He had several mortgages on the property (his residence) and his mortgage payments were past due. He was unable to pay his other bills, and unable to pay the litigation costs already incurred or those necessary to complete the preparation for trial.

[6]Barnard had previously asked for a reduction in the fee and Langer, anticipating the renewed request, had brought along one of his partners (Ronald Beck) to help him address that issue. Beck knew little about Barnard's case and never advised him, but Barnard

Barnard negotiated the details of the settlement documents with the City's attorney, and the changes Barnard requested were incorporated by the City.[7] By July 8, Barnard and the Perona firm had signed the final documents and the firm had sent them off to the City. Before the ink was dry (on July 13), Barnard wrote to the Perona firm to say he was contesting the entire attorney's fee because the firm was negligent. By the end of the month, the disputed fee (about $153,000) was placed in the firm's trust account and the undisputed balance of the settlement proceeds distributed to Barnard.

## B.

In 1999, Barnard sued the Perona firm, Langer, and Serbin for damages for legal malpractice, fraud, breach of fiduciary duty, and breach of contract, alleging that the firm and its lawyers had failed to inform Barnard of the engineer's increased estimate for the cost of repairs and of Barnard's right to recover prejudgment interest. As a result, claimed Barnard, he was "forced to settle with the City . . . for an amount substantially less than [he was] legally entitled to." The firm and its lawyers answered, and the firm cross-complained for its fees. Discovery ensued, and some of Barnard's claims were disposed of by summary adjudication in favor of the firm. Ultimately, the parties waived their right to a jury trial and Barnard's malpractice claims were tried to the court on offers of proof. The trial court granted the Perona firm's motion for nonsuit on the ground Barnard's damages were too speculative, then heard the cross-complaint for fees, rejected Barnard's claim that the firm had violated various ethics rules, and rendered judgment for the firm in the amount of $152,980.35, plus accumulated interest, plus costs. Barnard appeals.

## DISCUSSION

## I.

In three related arguments, Barnard contends the firm had a conflict of interest at the time of the settlement and later abandoned Barnard, and hence is not entitled to its fee. (See *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 16 [60 Cal.Rptr.2d 207] [in an action in which the lawyer admitted that he "sold out" his client and the class the client was seeking to represent to get a fee of about $10 million for himself, the lawyer's violation of his ethical duties deprived him of his right to a

---

nevertheless claimed in his malpractice action that Beck's presence was misleading and created a conflict of interest.

[7] In his legal malpractice action, Barnard claims the Perona firm abandoned him once the settlement was reached.

portion of his fee]; *Clark v. Millsap* (1926) 197 Cal. 765, 785 [242 P. 918] [the violation must be serious before the lawyer is deprived of all or even a portion of his fee].) Barnard's claims are frivolous.

## A.

Barnard contends the mere fact that the City had two open offers—one for $895,000 which required Barnard to sell his property to the City (and which would have generated a fee of about $200,000), the other which permitted Barnard to keep his property and get $680,000 for the damage (which was accepted and generated a fee of $153,000)—meant the Perona firm had a conflict of interest with Barnard. Nonsense. As the trial court put it, the tension between lawyer and client about fees always exists, which explains both the absence of any authority to support Barnard's position *and* the absence of any evidence to suggest the firm attempted to influence Barnard to accept one offer rather than the other.[8] *Of course, there is also the fact that Barnard accepted the deal that generated the lower fee.* There was no conflict. (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 546-547 [28 Cal.Rptr.2d 617, 869 P.2d 1142].)

## B.

Barnard contends there was a conflict because Beck came to the settlement conference to represent the firm vis-à-vis its fee, not to represent Barnard, and Barnard claims the Perona firm should have resigned or obtained Barnard's written consent to the conflict thereby created. Barnard also claims the Perona firm "misrepresented" Beck's status by withholding information about Beck's role at the conference. Barnard is wrong. First, Barnard was cocounsel at that time, and he was the one who put the firm in the position of defending the fee that Barnard had agreed to pay. Second, Barnard offers no authority to support his assertion that a partner's presence under these circumstances is subject to criticism for any reason. This is a nonissue. (*Santa Clara County Counsel Attys. Assn. v. Woodside, supra,* 7 Cal.4th at pp. 546-547 [the Rules of Professional Conduct address "tangible conflicts between the lawyer's and client's interest in the subject matter of the representation," not "the existence of general antagonism between lawyer and client"].)

---

[8]The only "evidence" Barnard points to in support of his claim that the firm encouraged one settlement over the other is a statement by Beck (the partner brought to the settlement conference) when he stopped by the courtroom in May to say "hello" to Langer. Beck chatted with Barnard and commented to him that a deal in which Barnard kept the property would raise issues about the disclosures he would have to make when he sold the property. Other than that offhand observation, Beck had no involvement in the case and rendered no advice to Barnard. This "evidence" doesn't prove a thing.

## C.

Barnard contends the firm abandoned him after the June 9 settlement conference. This is so, says Barnard, because Serbin admitted that neither she nor Langer negotiated with the City's lawyer about the details of the settlement documents. The problem with this argument is that it ignores the evidence that Barnard (in his role as cocounsel) dealt with the City's lawyer with regard to the settlement documents, after which the firm reviewed the documents submitted by the City's lawyer, signed them, returned them to the City's lawyer, filed a dismissal, and did everything else that needed to be done to wind up the case. *More to the point, Barnard has never suggested the settlement documents were inadequate.* When the firm stopped working for Barnard, there was nothing left to be done. (Compare *Joseph E. Di Loreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149 [1 Cal.Rptr.2d 636], with *Estate of Falco* (1987) 188 Cal.App.3d 1004 [233 Cal.Rptr. 807].)

## II.

Barnard contends the trial court should not have granted the firm's motion for nonsuit. We disagree.[9]

## A.

In ruling on the nonsuit motion, the trial court assumed the Perona firm was negligent and accepted Barnard's trial brief and opening statement as an offer of proof on the issue of damages. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117-118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].) It was thus established that (1) the fair market value of the property (undamaged) was $745,000; (2) prejudgment interest was valued at $40,000; (3) Barnard's nuisance claim (asserted in the inverse condemnation action) was worth $150,000; and (4) the current value of the damaged property was $20,000.[10] Accepting these figures, the most Barnard could

---

[9]We summarily reject Barnard's contention that he was entitled to present his malpractice case as a standard "trial within a trial" format, and that the nonsuit deprived him of this right. The trial court *accepted Barnard's characterization of the underlying case, assumed negligence, and used Barnard's damage calculations,* and based on that record granted nonsuit on the ground that Barnard's damages were speculative and not susceptible to proof, thereby mooting all other issues. In short, the court assumed the trial-within-this-trial had been resolved entirely in Barnard's favor. This is a nonissue.

[10]The gross amount for prejudgment interest was $250,000. Starting with that figure, the trial court applied section 1268.330, subdivision (a), which requires an offset against prejudgment interest when the owner remains in possession after the taking or damage, found the fair rental value of the property for the five-year period from the date of damage to the date of

have recovered had he kept the house was $935,000 ($745,000 + $40,000 + $150,000).[11]

The court found the difference between the amount Barnard received in settlement after deducting fees and costs ($680,000 + $20,000 for the property = $700,000) and the amount he reasonably could have recovered at trial ($935,000) was $235,000. The court then found that the general risks of trial avoided by the settlement, plus the specific possibility that the trier of fact might not have accepted Barnard's disputed (and very high) valuations, were worth considerably more than $200,000, and that Barnard had not established that he would have been able to recover anything more in a different settlement or at trial. As the court put it, there was the risk, "[o]ne, of getting less, and two, the cost of the proceedings, including the emotional wear and tear and the cost of people not working or whatever else they do with their time. So settlements are never equal to what the person would get at trial." As the court also noted, for Barnard to win, he "would have to show a significant difference, at minimum, between what the settlement was and what he . . . would have gotten at trial."[12]

## B.

We agree with the trial court that Barnard did not and could not prove damages, which in this context required proof that, but for the Perona firm's negligence, the inverse condemnation action would have had a better outcome, either by a higher settlement or at trial. It is not enough for Barnard to simply claim, as he did at the trial of this malpractice action, that it was possible to obtain a better settlement or a better result at trial. The mere probability that a certain event would have happened will not furnish the foundation for malpractice damages. " 'Damages to be subject to a proper award must be such as follows the act complained of as a *legal certainty.*' "

settlement was $210,000 (about $3,500 per month), and arrived at a net prejudgment interest figure of $40,000.

[11]We reject Barnard's contention that the trial court failed to consider the costs and fees that would have been awarded at trial. The court assumed such costs and fees were recoverable, and noted that they were also included in the settlement. The court's calculations are proper. (§§ 1036, 1263.310; 7 Miller & Starr, Cal. Real Estate (2d ed. 1990) Inverse Condemnation, §§ 23:11 - 23:13, pp. 621-626.)

[12]The court also found that, in a "settle and sue" case such as this (where a disgruntled client claims the underlying case was worth more than he settled for), the plaintiff's case cannot be proved without an expert opinion that the settlement was so "out of the ballpark" that the case should have been tried. (See *Marshak v. Ballesteros* (1999) 72 Cal.App.4th 1514, 1519 [86 Cal.Rptr.2d 1] [a plaintiff's claim that the case was worth more than he settled for is insufficient in this context; he must prove what the better outcome would have been].) Our resolution of the nonsuit on the ground discussed in the text makes it unnecessary to consider this additional basis for affirming the nonsuit.

(*Marshak v. Ballesteros, supra,* 72 Cal.App.4th at p. 1518, quoting *Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768 [343 P.2d 118]; see also *Budd v. Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433] [breach of a lawyer's duty that causes only nominal damages or speculative or uncertain harm does not support a malpractice cause of action]; *Thompson v. Halvonik* (1995) 36 Cal.App.4th 657, 663 [43 Cal.Rptr.2d 142]; *Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 131 [39 Cal.Rptr.2d 658]; *Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 746-747 [249 Cal.Rptr. 42] [the mere probability that a certain event would have happened will not furnish the foundation of an action for damages].)

None of Barnard's evidence does more than suggest speculative harm— because it does not demonstrate that, but for the Perona firm's negligence, Barnard's inverse condemnation case would have settled for more or gone to trial and resulted in a larger recovery, or a recovery on the same terms (allowing him to keep the property). Barnard offered no evidence that the City would have settled for more or that a trier of fact would have awarded more than the $680,000 plus the house, leaving the harm caused by the Perona firm's negligence as "only a subject of surmise, given the myriad of variables that affect [trials] of [inverse condemnation] actions. '[T]he mere probability that a certain event would have happened, upon which a claim for damages is predicated, will not support the claim or furnish the foundation of an action for such damages. . . .' " (*Thompson v. Halvonik, supra,* 36 Cal.App.4th at p. 663.)[13]

---

[13]The hindsight vulnerability of lawyers is particularly acute when the challenge is to the attorney's competence in settling the underlying case. As a leading legal malpractice text observes, the amount of a compromise is often "an educated guess of the amount that can be recovered at trial and what the opponent was willing to pay or accept. Even skillful and experienced negotiators do not know whether they received the maximum settlement or paid out the minimum acceptable. Thus, the goal of a lawyer is to achieve a 'reasonable' settlement, a concept that involves a wide spectrum of considerations and broad discretion. [¶] Theoretically, any settlement could be challenged as inadequate, and the resolution is likely to require a trial. . . . [¶] . . . [¶] A claim regarding an inadequate settlement often fails because it is inherently speculative. Negligence cannot be predicated on speculation that the attorney or another attorney could have secured a more advantageous settlement or the fortuitous event that a jury instead of a judge may have returned a higher award. A client, who was a plaintiff, must establish not only that concluding such a settlement fell outside the standard of care, but also what would have been a reasonable settlement and that such sums would have been agreed to and could have and would have been paid." (4 Mallen, Legal Malpractice (5th ed. 2000) Error - Settlement, § 30.41, pp. 582-585, fns. omitted, citing *Thompson v. Halvonik, supra,* 36 Cal.App.4th 657, and *Marshak v. Ballesteros, supra,* 72 Cal.App.4th 1514.) As the same text notes, the speculative nature of hindsight challenges to recommended settlements "often are protected as judgment calls. In evaluating and recommending a settlement, the attorney has broad discretion and is not liable for a mere error of judgment. The standard should be whether the settlement *is* within the realm of reasonable conclusions, not whether the client could have received more or paid less. No lawyer has the

Barnard's offer of proof was woefully inadequate and was little more than a wish list of damages, unsupported by evidence that the City would have settled for more, or by expert testimony to show that Barnard's amounts could have been recovered had the case been tried, or by evidence (even from Barnard's own mouth) to say that he would have gone through with the trial (which would require him to do more than just say that, in spite of his serious financial problems, he could have paid the costs involved in a trial).[14] In short, there is no evidence to even suggest that, had Barnard gone to trial or insisted on a different settlement, he would have recovered more than he received in settlement. (*Marshak v. Ballesteros, supra,* 72 Cal.App.4th at p. 1519; *Loube v. Loube* (1998) 64 Cal.App.4th 421, 426-427 [74 Cal.Rptr.2d 906].) Our de novo review of the nonsuit leads ineluctably to the conclusion that these omissions were fatal to Barnard's claims. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542 [50 Cal.Rptr.2d 395].)

## III.

The Perona firm has asked for $20,000 in sanctions for a frivolous appeal on the ground that the appeal is "totally devoid of merit and has been prosecuted for an improper motive"—harassment of Barnard's former lawyers "in an effort to avoid honoring [his] contractual obligations" to pay the attorneys their fee. Barnard filed opposition, and we issued an order to show cause to make it clear to the parties before oral argument that we were considering the imposition of sanctions. We have now considered the motion and the opposition, and have determined that this is indeed a meritless appeal that was pursued for an improper purpose.

### A.

Objectively or subjectively viewed, this lawsuit had no merit, less so the appeal. Most of the "issues" discussed in Barnard's brief are unsupported by relevant authority and none of them can withstand scrutiny. As our discussion of the malpractice claim shows, the Perona firm negotiated a fair and reasonable settlement which was accepted by a fully informed Barnard (who, as noted, worked for two years in the City Attorney's condemnation section

---

ability to obtain for each client the best possible compromise but only a reasonable one." (4 Mallen, at p. 588, fns. omitted.)

[14]This case was tried in August 2001, at which time Barnard was still living in his house and had spent less than $30,000 of his $680,000 settlement to repair the property he claims was so severely damaged that it is now worth only $20,000. The fact that Barnard remains in the house (and his failure to discuss or even cite § 1268.330) defeats his claim that his occupancy of the house before trial amounted to "house arrest" and that the trial court should not have offset the fair rental value of the property.

and who, presumably, is more fully informed than most lawyers about the subject matter of the underlying case). Barnard nevertheless attempted to increase his settlement proceeds by reducing the amount of the fee he had agreed to pay, then challenged the entire fee within days after the settlement was completed. Quite plainly, there was no malpractice and no damage to Barnard; the nonsuit was unquestionably proper, as was the judgment on the cross-complaint.

We are persuaded that, having lost in the trial court, Barnard—without cost to himself because he appears in propria persona—pursued this appeal in an effort to force the Perona firm to reduce its fee rather than incur further delays and expenses, not with a belief that there was even a possibility that he could prevail. That this is so is shown by Barnard's similar conduct in other cases.[15]

*Blanchard v. Barnard* (Super. Ct. L.A. County, 1994, No. BC065828). In 1992, Barnard was sued by another lawyer for unpaid legal fees and costs (about $40,000); Barnard (representing himself) cross-complained for damages, claiming he had "detrimentally relied on [the lawyer's] representation that he employed a secretary in that [Barnard] would have negotiated a different hourly rate for the time that [the lawyer] performed secretarial services and not lawyer-type services." Following trial to the court, a judgment was rendered in favor of the lawyer in the full amount of his claim, plus interest, plus costs. Barnard (representing himself) appealed and lost. (*Blanchard v. Barnard* (Jan. 19, 1996, B089741) [nonpub. opn.].)

*Barnard v. Rubin, Eagan & Kane* (Super. Ct. L.A. County, 1999, No. BC267998). In 1999, Barnard retained the Rubin firm to appear with him as co-counsel in the malpractice action before us on this appeal. A dispute arose between Barnard and the Rubin firm when Barnard refused to pay about $23,000 in accrued attorney's fees and costs. Although Barnard petitioned for arbitration and the Rubin firm responded, Barnard refused to provide the arbitrators with any evidence beyond the statement made in his petition. The dispute was nevertheless arbitrated, and a panel of three arbitrators rejected all of Barnard's claims, found the fee was not excessive, and awarded the Rubin firm the full amount of its claim. Barnard refused to be bound by the arbitrator's decision and (in February 2002) sued the Rubin firm for breach of contract. The Rubin firm cross-complained for its fee (and as far as we know that action is still pending).

It is clear that Barnard retains one lawyer after another, then challenges the fees he has agreed to pay and litigates each case beyond all reason—

---

[15]We grant the Perona firm's unopposed request for judicial notice of documents from the files of the two cases discussed in the text.

which he is able to do without cost to himself because he regularly appears in propria persona.

## B.

The facts of the case before us and the undisputed facts about Barnard's behavior in other cases make it clear that this appeal is both frivolous and taken solely for the purpose of delay. (Cal. Rules of Court, rule 26(a).) It is equally clear that Barnard has pursued this appeal for an improper motive, crying "malpractice" to increase his settlement and litigating, then appealing, to avoid the payment of the fee he agreed in writing to pay. In short, we are satisfied that this appeal was "prosecuted for an improper motive—to harass [the Perona firm and to] delay the effect of an adverse judgment—[and that the appeal] indisputably has no merit [because] any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179]; see also *Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 31-33 [96 Cal.Rptr.2d 553]; *Caro v. Smith* (1997) 59 Cal.App.4th 725, 738-739 [69 Cal.Rptr.2d 306].)

The amount requested by the Perona firm is both reasonable and appropriate under the circumstances. Two lawyers worked on this appeal, reviewing eight volumes of clerk's transcript plus a volume of reporters' transcripts, reviewing and analyzing Barnard's 52-page opening brief, reviewing Barnard's authorities, conducting their own research, and writing and editing the Perona firm's respondent's brief. One lawyer (whose billing rate is $250 per hour) spent 68 hours, another lawyer (whose billing rate is $175 per hour) spent 20 hours, and the estimate was that an additional three hours would be spent in preparation for and in appearing at oral argument. As a result, the fees incurred will exceed $20,000.

## DISPOSITION

The judgment is affirmed. Respondents are awarded sanctions in the amount of $20,000, payable forthwith by plaintiffs John and Virginia Barnard, and respondents are also awarded their costs of appeal. The Clerk of this Court is directed to mail a copy of this opinion to the State Bar of California, attention of the Chief Trial Counsel.

Spencer, P. J., and Ortega, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 10, 2003.