Filed 6/19/20

## CERTIFIED FOR PARTIAL PUBLICATION[*]

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KRISTA MASELLIS, | F075772 & F076362 |
| Cross-complainant and Respondent, | (Super. Ct. No. 2012536) |
| v. | |
| LAW OFFICE OF LESLIE F. JENSEN et al., | **OPINION** |
| Cross-defendants and Appellants. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County. Timothy W. Salter, Judge.

DiBenedetto & Lapcevic and William A. Lapcevic for Plaintiffs, Cross-defendants and Appellants.

Borton Petrini and Lauren Franzella for Stanislaus County Bar Association Family Law Section as Amicus Curiae on behalf of Plaintiffs, Cross-defendants and Appellants.

Dyer Law Firm, Michael J. Dyer and Dustin J. Dyer, for Defendant, Cross-complainant and Respondent.

-ooOoo-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the "FACTS," "PROCEEDINGS," and part II. of the Discussion.

The main legal question in these appeals is what burden of proof is appropriate in a legal malpractice action alleging an inadequate settlement? The defendant attorney addresses this question in two steps. First, she contends the elements of causation and damages in a " 'settle and sue' " legal malpractice case[1] must be proven to " 'a legal certainty.' " (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 166 (*Filbin*).) Second, she contends the legal certainty standard imposes a burden of proof higher than a mere preponderance of the evidence.

We disagree with defendant's second contention. In California civil litigation, a preponderance of the evidence is the default burden of proof. (Evid. Code, § 115.) No published legal malpractice case using the term "legal certainty" expressly states the default burden of proof is replaced by a standard higher than preponderance of the evidence. Indeed, there is little discussion of the burden of proof in the legal malpractice cases using the term "legal certainty." Consequently, we conclude the term is ambiguous. We resolve that ambiguity by interpreting the statement that a plaintiff must present "evidence showing to a legal certainty that" the alleged breach of duty caused an injury (*Filbin*, *supra*, 211 Cal.App.4th at p. 172) as simply referring to the degree of certainty inherent in the applicable burden of proof. For "settle and sue" legal malpractice actions, we conclude the applicable burden of proof is a preponderance of the evidence. (Evid. Code, § 115; see Johnson, *Causation and "Legal Certainty" in Legal Malpractice Law* (2018) 8 St. Mary's J. Legal Mal. & Ethics 374, 377–379.)

In the unpublished portion of this opinion, we conclude the trial court properly denied the motions for judgment notwithstanding the verdict and new trial because substantial evidence supports the jury's findings that the attorney's negligence was a

---

[1] Generally, a settle and sue legal malpractice action is where an initial lawsuit is settled before trial, by a client, who then sues the attorney alleging that the attorney's negligence caused the client to settle for less money than client would have recovered if the underlying case would have proceeded to trial.

substantial factor in causing client damages and those damages amounted to $300,000. These findings are not tainted by instructional error because the jury instruction on substantial factor causation subsumed *but for* causation. Thus, the findings set forth on the special verdict form establish the jury found that but for the attorney's negligence, client would have obtained a more favorable recovery if she had gone to trial.

We therefore affirm the judgment.

## FACTS[*]

In December 2012, Krista Masellis (Wife) filed a petition for dissolution of marriage against her husband, Scott Masellis (Husband). They had been married for over 13 years and had two daughters. The youngest was born in 2002.

Early in the dissolution proceedings, Wife was represented by a sequence of three attorneys. In February 2014, Wife retained appellant Leslie F. Jensen (Attorney) as her fourth attorney to provide legal services in the dissolution proceeding. In connection with the representation, Wife signed a written fee agreement.

### Court's Expert

Wife initially retained Gerald R. Deller, a certified public accountant experienced in family law matters, as an advisor in the dissolution proceeding. Subsequently, Attorney and counsel for Husband stipulated to Deller acting as the court's expert in this matter. Deller testified he became a certified public accountant in 1977 and since 1996 he had been engaged 239 times in marital dissolution matters. In 97 of those engagements, he was appointed as the court's expert under Evidence Code section 730. Attorney testified Deller had "impeccable credentials and his integrity in family court is off the charts."

---

[*]    See footnote, *ante*, page 1.

3.

After Deller became the neutral expert, Wife hired Clive Grimbleby, a certified public accountant, to act as her financial advisor. Husband was advised by Stephen Meester, his personal certified public accountant.

*Marital Estate*

The marital estate included interests in several business entities. Husband and Wife purchased a 50 percent equity interest in the family well drilling business, Masellis Drilling, Inc., after they were married. The business had been started by Husband's father and two uncles. The other 50 percent interest is owned by Husband's cousin, John K. Masellis. Using the adjusted net asset method to value the business, Deller estimated the community interest of Husband and Wife in the business was worth $1,710,000 as of December 31, 2013. During the trial, Husband testified the business had revenue of over $1.8 million a year.

Husband and Wife also purchased equity in the family agricultural business, Masroc Farms, LLC, which owns an almond orchard of 75 to 80 acres and operates an almond hulling and shelling business. Husband and Wife owned a 51 percent share of this business. Deller used the adjusted net asset method to value the community interest in the business at $365,000 as of December 31, 2013.

Husband and Wife also owned a 50 percent interest in Masroc Properties, LLC, a business that buys, improves and rents residential real estate. Deller valued the community interest in this business at $206,000 as of December 31, 2013.

In addition, Husband and Wife owned a one-third interest in a 25-acre almond orchard, sometimes referred to as the Yosemite Avenue property. Deller valued the community interest in this property at $268,000.

In March 2011, Husband and Wife purchased real property located on Del Rio Drive in Modesto (Del Rio property) for approximately $485,000 and undertook construction of a single-family residence. The project was still under construction during the dissolution proceeding. Deller estimated the net value of the community interest in

4.

the property at $875,000, which reflected debt of $344,028 against the property. Adding these two figures together produces estimated sale proceeds (prior to paying off the debt) of $1,219,028. In June 2016, after the settlement of the marital dissolution proceeding, Husband sold the Del Rio property for $1,250,000. After paying the costs of sale and the outstanding debt, Husband received $848,664.78, which was used to partially fund the amount owed to Wife under the marital settlement agreement.

The community property also included bank accounts of approximately $85,000; household items of $11,500; two retirement plans with balances totaling approximately $110,000; and a Chevy pickup valued at just under $10,000.

*Deller's Report*

Deller prepared a September 24, 2014 report listing (1) the community assets, (2) Husband's proposed distribution of the assets, and (3) Deller's revisions to Husband's proposal, which reflected information gathered and analyzed by Deller. Deller prepared two versions of the report. The first included as community property $261,823 in distributions made by Masellis Drilling, Inc. to Husband in 2013. This report listed the total community assets, less debts and reimbursements, as $3,268,113. The second version of Deller's report excluded the 2013 distributions from the community assets listed. As a result, the second version listed the total community assets, less debts and reimbursements, as $3,006,290.

*Deposing Husband*

Before and after Wife filed for divorce, Husband told her several times that he would leave her penniless. These statements caused Wife to be concerned that Husband would not fully and accurately disclose community assets. Husband's initial disclosure document omitted the 25-acre property on Yosemite Avenue planted to almonds, which also made Wife suspicious of the information he provided. Wife testified that she told Attorney a handful of times that she wanted Husband's deposition taken because of concerns he was hiding assets and was claiming liabilities in the form of promissory

5.

notes that were not real. At one point, Attorney asked Wife, "Why would we take his deposition[?]"

The testimony of Wife and Attorney differ as to the details Wife provided in identifying other property that might belong to the community. Besides informing Attorney about the omitted Yosemite Avenue property, Wife testified she told Attorney about the house in Oakdale that Husband purchased and "another one out in the county club out there." Wife's testimony is supported in part by Husband's testimony that he bought a house in Oakdale.

Attorney denied receiving information from Wife about these and other properties. Instead, she testified Wife wanted her to do more investigation into assets and income that Wife believed existed and when Attorney asked Wife "what assets and income that she thought may be there that I needed to look at[, s]he didn't know." Attorney's testimony is contradicted by inferences drawn from an e-mail sent by Attorney to expert Grimbleby on Monday, September 29, 2014, which stated: "With regard to the acquisition of the Oakdale house, I am advised John[, Husband's cousin,] took a draw from one of the companies (or several of the companies) and paid for the house." This e-mail supports Wife's version of events—namely, that she told Attorney about the Oakdale house and raised the question about how its purchase was funded.

The conflict in the testimony of Wife and Attorney on this matter is resolved by viewing the evidence in the light most favorable to Wife, the prevailing party. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 (*Hauter*); *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246 (*Pope*) [appellants' fundamental obligation to appellate court is to set forth the version of events most favorable to respondents].) Attorney's appellate briefing seems to have inverted this basic principle of appellate practice. Attorney's opening brief asserts: "Wife demanded that Attorney conduct an additional investigation of phantom assets to justify her settlement demand, yet when asked what assets had not been considered and where such assets were located, Wife could not identify either." We

reject Attorney's version of events because Wife did identify an asset (a house) and its location (Oakdale). The foregoing is only one of Attorney's many failures to view the evidence in the light most favorable to Wife. For purposes of resolving this appeal, it is not necessary for this court to list and correct all such failures.

*Settlement Conference*

A mandatory settlement conference was scheduled for Friday, September 26, 2014, with a trial scheduled for September 30, 2014, the following Tuesday.[2] The appellate briefing sets forth conflicting accounts of Wife's settlement demand at that conference. Attorney stated, "Wife formulated a demand for settlement comprised of an equalization payment of $1.2 million dollars and an increase of [monthly] child and spousal support from $18,786 to $20,300."

Wife testified she remained in the hallway during the settlement conference and at some point Attorney came out of the courtroom with a sticky note containing the figure $800,000 and said it was the figure Wife needed to accept. Wife told Attorney her number was different. Furthermore, Wife was taken aback by the number because it was much lower than what the accountants had suggested and "way lower than the low number on the spectrum." Wife was asked at trial if she gave Attorney a number in response to the $800,000 recommended by Attorney. Wife answered, "That's where I was earlier getting confused on the 1.2 and 1.5. Because when [Attorney] was saying $800,000, I had said the 1.2. And what I had wanted to say was 1.2 and half the proceeds of the [Del Rio property]." Wife was unable to finish stating her position that day because Attorney interrupted Wife and said, "I'm not going in there with more than $800,000. What's your number?" Wife described her reaction to Attorney's statement by stating: "I was speechless. I felt like everything for me and my children was just

---

**2**      Attorney testified she had another trial scheduled for October 2, 2014.

7.

falling through my fingers. Like, I didn't know how to grasp it, and I just felt trapped. I felt, like really scared and didn't know what to do."

Wife responded to Attorney's statement that Attorney was not going to offer Husband more than $800,000 by saying, "That is because you don't have mine and my daughters' best interest at heart." Attorney, who had been sitting next to Wife, jumped up and said, "That's it. I'm done."[3] Attorney walked away, and Wife thought Attorney had quit. Wife was afraid she might be accused of abandoning her case if she left the courthouse, so Wife went into the courtroom to explain to the judge what had happened. Unable to speak with the judge, Wife spoke with the court clerk. In response to Wife's question about getting an extension, the court clerk told her that was not going to happen. Wife went to her car and cried.

*Post Settlement Conference*

Wife called Grimbleby, explained to him what had happened, and told him Attorney had quit. Wife and Attorney did not talk with one another over the weekend. However, both Wife and Attorney were in contact with Grimbleby and we presume he told Wife that Attorney had not quit and settlement negotiations were continuing.

Attorney testified that she communicated with Grimbleby on Friday afternoon after the settlement conference, telling him what had happened and that she was going to try over the weekend to get Husband's attorney to negotiate and come to some sort of resolution. Attorney testified that she and her legal assistant worked all day on Saturday and were in contact with Husband's attorney, Deller and Grimbleby. Also on Saturday, Attorney sent Grimbleby an e-mail advising him that she was not willing to meet face-to-face with Wife again without a third person being present, such as Grimbleby or her staff.

---

[3] Attorney's version of the exchange is that she told Wife that she was done with the conversation and left to attend another settlement conference in another department. Viewing the evidence in the light most favorable to the prevailing party, we again conclude the jury believed Wife's testimony and did not believe Attorney's version.

Attorney testified that she worked most of Sunday developing a marital settlement agreement and believed that she had hammered out the skeleton of an agreement. Attorney testified that Grimbleby was important in the process because he gave Attorney regular input on Saturday and Sunday about Wife's thinking and what she wanted as an end result.

On Monday, September 29, 2014, Wife spoke with Grimbleby and told him that they were not prepared for trial. Midday, Attorney sent Grimbleby an e-mail stating she had spoken with Husband's attorney after he and Husband had gone over a draft of the marital settlement agreement. The e-mail reiterated that Attorney was "not willing to meet with or communicate with [Wife] without a third party present."

At some point on Monday, Wife was told she should be at Attorney's office on Tuesday morning. That morning, while Wife sat waiting in the parking lot, Wife received a call from Grimbleby and he asked Wife to drive to his office. When Wife arrived, Grimbleby told her a settlement had been written up and delivered to his office. He took Wife to a small room and left her with the document so she could read it. When Grimbleby returned, Wife told him she had skimmed over the document, looked it over but did not really understand it. Wife asked him what he thought, but received no guidance.

When Wife was asked what she was thinking at that point, with the settlement agreement in front of her and trial a half-hour away, she responded: "I was freaking out. I was thinking, 'If I don't sign this, we go to trial. We're not prepared.' I felt completely trapped.… I didn't know what to do." Faced with this dilemma, Wife signed the agreement. After Wife signed the agreement, she never had any contact with Attorney.

*Settlement Terms*

The marital settlement agreement provided Wife would be paid $1.2 million for a complete settlement of the dissolution. Wife was to receive an initial payment of $50,000 and the remaining balance would be paid from the proceeds from the sale of the Del Rio

9.

property. Wife was to receive the $1.2 million no matter what the selling price of the Del Rio property was. In addition, the agreement provided Wife would be paid $20,300 per month in spousal and child support.

On October 2, 2014, the marital settlement agreement and a judgment and notice of entry of judgment were submitted to the trial court. In addition, Attorney submitted a notice of withdrawal.

The marital settlement agreement did not classify the equalization payment of $1.2 million as a money judgment. A memorandum of understanding signed by Attorney, counsel for Husband, and Husband confirmed that it was not a money judgment. Attorney testified that Wife initialed the memorandum of understanding, but the initials attributed to Wife were actually those of Husband's attorney. One consequence of the amount owed not being a money judgment was that it did not bear interest. Because the settlement agreement provided for Wife to be paid from proceeds from the sale of the Del Rio property, Wife's receipt of the balance owed was delayed. After the Del Rio property sold in June 2016, Husband paid Wife $950,000.

In November 2016, Husband's attorney sent a letter to Wife's new attorney, which enclosed a cashier's check in the amount of $200,000, which was the remaining balance of the $1.2 million stated in the marital settlement agreement. The letter stated: "You are authorized to deliver said check to [Wife] **ONLY** at such time as she has signed the Acknowledgement of Satisfaction of Judgment and that document has been returned to my office." This demand appeared unreasonable to Wife because the marital settlement agreement was not a money judgment and she thought the acknowledgment of satisfaction might be used by Husband to argue he no longer owed any support payments. After communication between the attorneys, Husband's attorney changed the request to ask for a partial satisfaction of judgment, but the matter had not been resolved when the malpractice action was tried in December 2016.

# PROCEEDINGS

During Attorney's seven-month representation of Wife in the marital dissolution proceeding, she billed Wife a total of $43,145 for professional services. Two payments were made by Husband and a balance of $23,977.30 remained unpaid after the settlement was reached. In November 2014, Attorney sent Wife a notice of her right as a client to arbitration of a fee dispute. Wife did not respond to the notice. In January 2015, Attorney filed a collection action against Wife for the unpaid balance. Wife responded by filing a cross-complaint against Attorney alleging professional negligence, breach of fiduciary duty, fraud, and breach of contract.

In November and December 2016, an 11-day jury trial was held. The witnesses presented included Attorney, Wife, Husband, Husband's attorney, and the certified public accountants, Deller and Grimbleby. In addition, three attorneys—James Hennenhoefer, Dennis Duncan, and Jakrun Sodhi—testified as experts.

Dennis Duncan testified as Attorney's expert. He has been certified as a family law specialist since 1996 and he testified on the duty of care an attorney owes to the client. James Hennenhoefer began practicing law in 1971 and is certified as a family law specialist. He also does some work as an expert witness, retained by the defense about 70 percent of the time and by plaintiff about 30 percent of the time. Hennenhoefer testified as Wife's expert witness, giving his opinion on whether Attorney's conduct met the standard of care and whether she breached the fiduciary duty owed to Wife. Hennenhoefer testified Attorney's work was "[s]ubstantially below the standard of care on at least a half a dozen different areas."

In this appeal, Attorney does not directly challenge the jury's finding that Attorney was negligent in her representation of Wife. Nonetheless, we summarize Hennenhoefer's testimony about the breaches of the standard of care to provide background for the

---

\* See footnote, *ante*, page 1.

11.

discussion of whether Wife proved the causation and damages elements of her professional negligence cause of action. First, he stated Attorney had taken no depositions in the case and it is below the standard of care not to take depositions in a family law case where the assets are in the million-dollar range. Second, Hennenhoefer stated it was below the standard of care to hire a mutual expert and accept what the mutual expert said, rather than hiring one's own experts. Third, on a point related to the first two, he testified it would have been below the standard of care to stipulate to the statements of the mutual expert and go to trial without any additional experts. Fourth, Hennenhoefer testified that the marital settlement agreement was "woefully inadequate" because it contained no money judgment, it did not provide for interest to accrue on the amount owed to Wife, it provided no security for the amount owed, and it established no time limits for the payment of Wife. It made her wait for payment until the Del Rio property sold, an event controlled by Husband. Fifth, Hennenhoefer stated it appeared "there was some kind of tiff or problem between counsel and her client, and [Attorney] simply abandoned the client."[4] He stated an attorney had a duty to continue to communicate with the client and that duty cannot be assigned to someone else. Sixth, Hennenhoefer testified it was below the standard of care to assume the trial could have been completed in two days.

Sodhi was hired by Wife to handle issues relating to the performance of the marital settlement agreement. During the trial, Sodhi gave his opinion as to a reasonable

---

[4]      Hennenhoefer described handling differences of opinion between the lawyer and the client as follows: "If the client wants to do something absolutely insane, you tell the client, 'Look. I'm the captain of this ship, and you're the owner of the ship. But if you want to go down that road and you want to run it up on the reef and sink it, that's fine, but I'm going to argue with you and dissuade you from doing that.' [¶] You got to stay in active contact with the client. You got to work with the client, and you got to do, within reason, what the client wants to do. And if the client wants to go to trial, then you need to go to trial. And—and if you haven't, for whatever reason, been prepared, you don't run off into the sunset and avoid the trial."

12.

outcome if the issues relating to the marital estate had been tried, stating $1.5 million was at "the low end of what could have been obtained."

*Closing Arguments*

During closing argument, counsel for Attorney summarized the case by stating Wife was a challenging client and "[s]he didn't—wouldn't hear what she didn't want to hear. And I submit to you that … therein really is the crux of this whole thing. Because in her mind, [Wife] had a number she wanted, 1.5 million, and four lawyers and two experienced CPAs couldn't get it through her head that she was not entitled to 1.5 no matter how you shook this thing out."

Wife's counsel responded by referring to Attorney's testimony that a $1.5 million settlement demand was nonsensical, comparing Attorney's testimony to Deller's September 24, 2014 report, which contained two options. Counsel showed the jury a slide of Deller's report and stated the first option had $1.63 million to Husband and $1.62 million to Wife, which was above the number Attorney characterized as nonsensical, and stated the second option had $1.5 million to Husband and $1.49 million to Wife. Counsel for Wife then argued: "This is the week before trial after considering everything. So [Wife] may have been a little more sensical [] than [Attorney] was giving her credit for. But Mr. Deller wasn't the only person who had an evaluation in this same range." Counsel then showed a slide of an evaluation prepared by Grimbleby, which had $1.253 million as the low, $1.579 million as the medium, and $1.639 million as the high.

Counsel for Wife addressed damages by asserting Wife should have received $1.5 million and referring to Sodhi's testimony and paraphrasing Sodhi as testifying " 'easy 1.5 minimum.' " He also argued Wife was entitled to recover interest resulting from the delay in the payment and $3,000 Wife paid Sodhi to deal with issues relating to performance of the settlement agreement. He asserted Wife's total damages were $586,333, which included interest of $283,333. In his final comment to the jury, counsel

13.

for Wife asserted Attorney "is liable for this, and she should pay [Wife] the damages that you feel are necessary.  Thank you."

*Jury Instructions*

After closing arguments, the trial court instructed the jury.  Previously, on December 9, 2016, the court and counsel discussed the instructions that would be given.  Among the instructions the court stated it would give were CACI No. 200, Obligation to Prove—More Likely True Than Not True; No. 600, Professional Negligence, Standard of Care; No. 601, Negligent Handling of Legal Matter; No. 602, Success Not Required; No. 603, Alternative Legal Decisions and Strategies.  These instructions were among those proposed by Attorney.  CACI No. 200 provides:

> "A party must persuade you, by the evidence presented in court, that what he or she is required to prove is more likely to be true than not true.  This is referred to as 'the burden of proof.'
>
> "After weighing all of the evidence, if you cannot decide that something is more likely to be true than not true, you must conclude that the party did not prove it.  You should consider all the evidence, no matter which party produced the evidence.
>
> "In criminal trials, the prosecution must prove that the defendant is guilty beyond a reasonable doubt.  But in civil trials, such as this one, the party who is required to prove something need prove only that it is more likely to be true than not true."[5]

> The version of CACI No. 601 proposed by Attorney stated:

> "To recover damages from [Attorney], [Wife] must prove that she would have obtained a better result if [Attorney] had acted as a reasonably careful

---

[5]     Attorney's proposed version of this instruction included a handwritten addition at the end, which stated "except for [Wife's] fraud claim against [Attorney], which has a higher burden of proof."  The fraud claim was not presented to the jury and, therefore, we infer that addition was not read to the jury.

14.

attorney.  [Wife] was not harmed by [Attorney's] conduct if the same harm would have occurred anyway without that conduct."**6**

On December 12, 2016, the trial court informed the parties that it determined CACI No. 430, Causation: Substantial Factor, needed to be given.  The next morning, the court and counsel addressed the jury instruction and special verdict forms and the court stated CACI No. 430 would be given to the jury.  The substantial factor instruction related to questions asked on the special verdict forms.  The third question on the special verdict for the professional negligence cause of action asked if Attorney's negligence was a substantial factor in causing Wife's damages.  Also, the special verdict for the breach of fiduciary duty cause of action asked if Attorney's breach of her fiduciary duty was a substantial factor in causing Wife's damages.

*Jury Verdict*

On December 14, 2016, the day after closing arguments, the jury returned its verdict.  The jury rejected Attorney's breach of contract claim, finding she did not substantially perform her side of the contract.  On Wife's cross-complaint, the jury found Attorney was negligent, Wife was damaged, and Attorney's negligence was a substantial factor in causing the damages.  The jury also found Attorney breached the fiduciary duty owed to Wife, Wife was damaged, and the breach of fiduciary duty was a substantial factor in causing Wife's damages.  The jury awarded Wife damages of $300,000.

*Motion for JNOV*

In December 2016, Attorney filed a motion for judgment notwithstanding the verdict, asserting Wife failed to prove the elements of causation and damages.  In February 2017, after Wife's opposition and Attorney's reply papers were filed, the trial court held a hearing on the motion for judgment notwithstanding the verdict.

---

**6**     The Directions for Use for CACI No. 601 state:  "The plaintiff must prove that *but for* the attorney's negligent acts or omissions, he or she would have obtained a more favorable judgment or settlement in the underlying action. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241.)  The second sentence expresses this 'but for' standard."

15.

Near the beginning of the hearing, the trial court stated it had erred in giving substantial factor instruction instead of a "but for" instruction. The court stated its recollection of the discussion about jury instructions was that no one raised any objection and the court decided to give the substantial factor instruction "because there were no instructions offered by either side on causation." The court stated the issue about the causation instruction might be raised in a motion for new trial and it was not certain whether the use of the substantial factor instruction would require a new trial. The court then heard arguments on the motion for judgment notwithstanding the verdict and took the matter under submission.

Counsel for Attorney argued *Filbin, supra,* 211 Cal.App.4th 154 and other cases using the phrase "legal certainty" required Wife to "prove that, if not for the malpractice, she would certainly have received more money in settlement or trial." Counsel argued there was no substantial evidence to support Wife "proving a better outcome to a legal certainty should she have gone to trial on the underlying matter, and she could not prove what that amount would be." Counsel asserted (1) "the Court gets to decide causation as a matter of law" and (2) it was clear on the face of the evidence that causation had not been proven.

In response, Wife's counsel summarized the theory of the case: "This was a case based upon the settlement and the lack of preparation and ability of [Wife] to go to trial." Wife's counsel argued Wife did not "need to show that [Husband] was going to reach a settlement higher than 1.2 million." Instead, counsel argued Wife had shown it was more likely than not that she would have gotten a better outcome at trial and "that's what we showed by presenting our documentation and our expert testimony."

After hearing arguments, the court took the matter under submission and directed Wife's counsel to prepare a judgment reflecting the jury's verdict. In April 2017, the trial court issued a written ruling denying Attorney's motion. The court discussed *Filbin* and concluded the but for, or more likely than not standard of proof described in *Viner v.*

16.

*Sweet, supra,* 30 Cal.4th 1232 (*Viner*) and *Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180 (*Wise*) applied to the issues of causation and damages. That standard requires a plaintiff to introduce evidence which affords a reasonable basis for the finding that it is *more likely than not* that the conduct of the defendant was a cause in fact of the result. (*Viner*, *supra*, at p. 1243; *Wise*, *supra*, at pp. 1190–1191.) The more-likely-than-not phrasing describes a preponderance of the evidence burden of proof. (See *In re Rogers* (2019) 7 Cal.5th 817, 834; CACI No. 200.)

In June 2017, Attorney timely appealed the trial court's ruling denying her motion for judgment notwithstanding the verdict. On July 7, 2017, the court filed a judgment after jury trial that implemented the jury's verdict by awarding Wife $300,000.

<u>Motion for New Trial</u>

After entry of the judgment, Attorney filed a motion for new trial. In September 2017, the parties argued the motion, and the trial court took the matter under submission. Within a few days, the court issued a written ruling denying the motion for new trial, which included the court's determination that the motion had been timely filed. The court stated that any error in giving the substantial factor jury instruction using CACI No. 430 was harmless error because the "but for" test for causation is subsumed in the substantial factor test and the court's inclusion of the final bracketed sentence in the form instruction adequately set forth the "but for" test. The court also stated the testimony of Sodhi was properly admitted because he possessed sufficient expertise and qualification to express the opinions given and his testimony did not invade the province of the jury. In September 2017, Attorney filed a notice of appeal from the judgment after jury trial and from the order denying the motion for new trial.

<u>Consolidation</u>

In October 2017, Attorney filed a motion to consolidate the two appeals. In our order denying consolidation, we stated the denial would not preclude this court from considering the appeals together or subsequently consolidating them on our own motion.

After oral argument, we consolidated the appeals so that a single opinion resolving all of the issues raised could be filed.

## DISCUSSION

I.      BURDEN OF PROOF

A.      <u>Issue Presented</u>

The parties disagree on the burden of proof applicable to the elements of causation and damages in a "settle and sue" legal malpractice action.  Attorney argues *Filbin* is the controlling authority.  In *Filbin*, the First District stated:

> "To prevail in a legal malpractice action, '[s]imply showing the attorney erred is not enough.'  [Citation.]  The plaintiff must also establish that, but for the alleged malpractice, settlement of the underlying lawsuit would have resulted in a better outcome.  [Citations.]  'Thus, a plaintiff who alleges an inadequate settlement in the underlying action must prove that, if not for the malpractice, she would *certainly* have received more money in settlement or at trial.'  [Citation.]  [¶]  The requirement that a plaintiff need prove damages to 'a legal certainty' is difficult to meet in any case.  It is particularly so in 'settle and sue' cases .…"  (*Filbin*, *supra*, 211 Cal.App.4th at p. 166.)

Relying on *Filbin*, Attorney argues the higher burden of proof in "settle and sue" cases is an uncontroverted principle that must be applied in the present case.  Attorney interprets the "legal certainty" standard enunciated in *Filbin* as a "burden of proof that requires evidence beyond a mere preponderance."

In contrast, Wife contends heightened standards for proving causation and damages do not apply in legal malpractice actions.  Wife argues legal malpractice actions, including "settle and sue" cases, are subject to the same proof requirements as other types of negligence claims.  Wife's argument contains three main assertions.  First, a plaintiff must prove that, *but for* the alleged negligence, the harm would not have happened.  Second, the but for test for factual causation is subsumed in California's substantial factor test for causation.  Third, a plaintiff can carry the burden of proving causation by introducing evidence that affords a reasonable basis for the finding that it is

18.

more likely than not that the alleged malpractice of the defendant was a cause in fact of the harm.

### B.     Basic Principles

The parties' contentions raise the following legal question:  What burden of proof applies to the elements of causation and damages in a "settle and sue" legal malpractice action?  The method of analysis we use to answer this question differs from the parties' because we begin with the statutory provisions governing burdens of proof in civil litigation and work step by step to our conclusion.

### 1.     *Statutory Definitions*

Division 2 of the Evidence Code defines many words and phrases.  Here, we consider the definitions of evidence, proof and law before addressing the definition of burden of proof.  " 'Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.)  " 'Proof' is the establishment by evidence of a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, § 190.)  " 'Law' includes constitutional, statutory, and decisional law." (Evid. Code, § 160.)  These three terms appear in the statutory definition of burden of proof.

> " 'Burden of proof' means the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court.  The burden of proof may require a party to raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact [1] by a preponderance of the evidence, [2] by clear and convincing proof, or [3] by proof beyond a reasonable doubt.

> "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115.)

The last sentence of Evidence Code section 115 "makes it clear that 'burden of proof' refers to the burden of proving the fact in question by a preponderance of the evidence unless a heavier or lesser burden of proof is specifically required in a particular

case by constitutional, statutory or decisional law." (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) p. 42 (7 Cal. Law Revision Com. Report).) In other words, Evidence Code section 115 establishes the preponderance of the evidence as the "default standard of proof in civil cases." (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546; see *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 483 [general rule in California is that issues of fact in civil cases are determined by a preponderance of the evidence] (*Weiner*).)

Consequently, the general rule in Evidence Code section 115 will identify the applicable standard of proof for the elements of causation and damages in a legal malpractice action unless the exception applies. Determining whether the exception applies—that is, whether another standard of proof is "otherwise provided by law"—is guided in part by the statutory definition of "law." (See *Weiner*, *supra*, 54 Cal.3d at p. 483; Evid. Code, § 160.) Accordingly, a complete analysis of the legal question presented in this appeal must consider whether a constitutional provision, a statute, or a judicial decision requires a burden of proof higher than the preponderance of the evidence for the elements of causation and damages in a "settle and sue" legal malpractice action. (See *Weiner, supra,* at p. 483.)

### 2. Constitutional Provisions

The parties have not cited, and we have not located, any constitutional provision *expressly* stating the burden of proof for legal malpractice actions or, more specifically, for the elements of causation and damages in a "settle and sue" legal malpractice action. In addition, the parties have referred to no authority establishing or suggesting a higher level of proof than the preponderance of the evidence is *implied* by the state or federal due process clause. We mention the due process clauses because they are usually the constitutional source of a heightened burden of proof. (E.g. *Santosky v. Kramer* (1982) 455 U.S. 745, 747–748 [in proceeding to terminate parental rights, Due Process Clause of

the Fourteenth Amendment requires state to support its allegations with clear and convincing evidence].)

### 3. *Evidence Code Provisions: Allocation of the Burden*

Before examining the provisions in division 5 of the Evidence Code addressing the *level* of proof required, we review the provisions governing the *allocation* of the burden of proof. Allocation of the burden is not an issue in this appeal because the parties accept that the plaintiff in a legal malpractice action has the burden of proving the elements of his or her cause of action. Nonetheless, to provide context and illustrate a method of analysis that parallels the analysis used to determine the level of proof required, we review the Evidence Code provisions that allocate the burden of proof and a few cases that apply those provisions.

Evidence Code section 500 states: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." The exception at the beginning of this provision uses the exact same words as the exception in Evidence Code section 115. In addition to the general rule, the Evidence Code contains provisions addressing who has the burden of proving specific types of claims. For instance, Evidence Code section 521 addresses who must prove a particular type of wrongdoing: "The party claiming that a person did not exercise a requisite degree of care has the burden of proof on that issue." (Evid. Code, § 521.) Under these provisions, the plaintiff in any civil action alleging negligence would have the burden of proving a breach of the duty of care.

The California Law Revision Commission's comment to Evidence Code section 500 explains the exception by stating it was "included in recognition of the fact that the burden of proof is sometimes allocated in a manner that is at variance with the general rule." (7 Cal. Law Revision Com. Report, *supra*, p. 89.) Because the exception uses the term "law" and "law" is defined to include judicial decisions (Evid. Code, § 160), the

21.

exception recognizes that "courts may alter the normal allocation of the burden of proof." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1188.)  When courts are asked to create an exception to the general rule and shift the allocation of the burden of proof, they employ an established method of analysis.  "In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors:  [1] the knowledge of the parties concerning the particular fact, [2] the availability of the evidence to the parties, [3] the most desirable result in terms of public policy in the absence of proof of the particular fact, and [4] the probability of the existence or nonexistence of the fact."  (7 Cal. Law Revision Com. Report, *supra*, p. 89.) This approach has been adopted by our Supreme Court.  (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 660–661 (*Lakin*).)  A court's consideration of these factors and decision on whether to apply the general rule or shift the burden of proof is, at its foundation, the resolution of a question of policy and fundamental fairness based on experience, with fundamental fairness acting as the lodestar.  (*Adams v. Murakami* (1991) 54 Cal.3d 105, 120.)

To summarize, the statutory exception in Evidence Code section 500 is worded to acknowledge that courts have the authority to shift the burden of proof rather than apply the statute's general rule.  Furthermore, California courts have adopted a specific approach for deciding whether to alter the allocation of the burden of proof.  (*Lakin*, *supra*, 6 Cal.4th at pp. 660–661; see *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1267–1268 [principles governing whether to shift the burden of proof].)  Both of these statements also hold true when courts consider whether to shift from the preponderance of the evidence standard of proof to a higher burden of proof.

### 4.    *Evidence Code Provisions:  Level of Proof*

Besides the general rule contained in Evidence Code section 115, burdens of proof are addressed in an Evidence Code provision setting forth general requirements for instructing a jury on the burden of proof.  Evidence Code section 502 provides:

> "The court on all proper occasions shall instruct the jury as to which party bears the burden of proof on each issue and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact [1] by a preponderance of the evidence, [2] by clear and convincing proof, or [3] by proof beyond a reasonable doubt."

Evidence Code section 502 lists the same three standards contained in Evidence Code section 115.  The three specific standards are the most common burdens of proof used in California, but they are not an exclusive list.  (Assem. Com. on Judiciary, com. reprinted at 29B pt. 1A West's Ann. Evid. Code (2011 ed.) foll. § 115, p. 17.)  "[I]n some cases the law may prescribe some other burden of proof."  (*Ibid*.)

The Evidence Code does not prescribe the burden of proof applicable in a legal malpractice action.  Furthermore, the parties have not cited, and we have not located, any statute outside the Evidence Code addressing the burden of proof for legal malpractice actions.  Consequently, we consider whether any judicial decisions have provided for a burden of proof other than the preponderance of the evidence standard.

### 5.    *Judicial Decisions: Method Used*

Our review of the cases begins with decisions specifically addressing whether to alter Evidence Code section 115's general rule governing the standard of proof and summarizes the analysis or methodology ordinarily used by courts when deciding whether to apply a preponderance of the evidence standard or a different level of proof. The summary is derived primarily from one Supreme Court decision (*Weiner*, *supra*, 54 Cal.3d 476) and three decisions of the Courts of Appeal (*In re Marriage of Ettefagh* (2007) 150 Cal.App.4th 1578 (*Ettefagh*); *Baxter Healthcare Corp. v. Denton* (2004) 120

23.

Cal.App.4th 333 (*Baxter*); *In re Marriage of Peters* (1997) 52 Cal.App.4th 1487 (*Peters*).)

The first part of the analysis states that (1) Evidence Code section 115 sets forth a general rule, (2) the general rule refers to the preponderance of the evidence standard, (3) Evidence Code section 115 contains an exception to the general rule, and (4) the exception's phrase "otherwise provided by law" includes "constitutional, statutory, and decisional law" (Evid. Code, §§ 115, 160). (*Weiner*, *supra*, 54 Cal.3d at p. 483; *Ettefagh*, *supra*, 150 Cal.App.4th at p. 1585; *Baxter*, *supra*, 120 Cal.App.4th at pp. 364–365; *Peters*, *supra*, 52 Cal.App.4th at p. 1490.) Some cases expand upon the exception's reference to decisional law by observing that "the determination of the degree of proof to be applied in a particular situation is the kind of question which has traditionally been left to the judiciary to resolve. (*Weiner*, *supra*, 54 Cal.3d at p. 483 .…)" (*Peters*, *supra*, 52 Cal.App.4th at p. 1490; see *Baxter*, *supra*, 120 Cal.App.4th at p. 365.)

The second part of the analysis sets forth the general principles that establish the framework for the court's examination of the appropriate degree of proof. In *Ettefagh*, the First District described those principles:

> "As our Supreme Court has observed, the selection of a standard of proof reflects the significance our society attaches to a given issue. ' "The function of a standard of proof ... is to 'instruct the factfinder concerning the degree of confidence our society thinks [the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication.' [Citation.] The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." ' (*Weiner v. Fleischman*, *supra*, 54 Cal.3d at p. 487, quoting *Addington v. Texas* (1979) 441 U.S. 418, 423; accord, *In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1490.) The standard of proof required in a given situation 'may depend upon the "gravity of the consequences that would result from an erroneous determination of the issue involved." [Citation.]' (*Weiner*, at p. 487.)" (*Ettefagh*, *supra*, 150 Cal.App.4th at p. 1589.)

The third part of the analysis examines the principles specific to the particular standards of proof under consideration. For instance, "[w]hen the preponderance of the evidence standard applies, the parties to an action share the risk of an erroneous determination more or less equally. (*In re Marriage of Peters*, *supra*, 52 Cal.App.4th at p. 1490.) ' "Any other standard expresses a preference for one side's interests" ' (*Weiner v. Fleischman*, *supra*, 54 Cal.3d at p. 488 .…" (*Ettefagh*, *supra*, 150 Cal.App.4th at p. 1589.) Generally, imposing a burden of proof higher than a preponderance of the evidence "occurs only when interests ' "more substantial than mere loss of money' " are at stake." (*Id.* at p. 1590.)

The fourth and final part of the analysis weighs the interests of the litigants that are at stake, the risks of error, and the consequences of an erroneous determination of the issue involved. (See *Ettefagh*, *supra*, 150 Cal.App.4th at pp. 1590–1591.) After weighing these factors, the court reaches a conclusion as to the appropriate burden of proof. (*Ibid.*) For example, in marital dissolution proceedings where the parties contest the division of property, each spouse has an identical economic interest at risk—interests that are inverse but equal. (*Ibid.*; *Peters*, *supra*, 52 Cal.App.4th at p. 1491.) Where the economic interests are identical, it is appropriate to apply a preponderance of the evidence standard because that standard results in a roughly equal distribution of the risk of error. (*Ettefagh*, *supra*, at p. 1591; *Peters*, *supra*, at p. 1491.)

C.      The Legal Certainty Standard

The foregoing discussion establishes the foundation for analyzing the appropriate standard of proof. Next, we turn to the specific legal question raised by the parties' contentions—that is, what burden of proof applies to the elements of causation and damages in a "settle and sue" legal malpractice action. We consider the cases relied upon by Attorney to see if (1) they undertake the usual analysis for adopting a higher burden of proof than the preponderance of the evidence or (2) explicitly state the "legal certainty"

25.

standard is a different, higher burden of proof than the preponderance of the evidence standard.  None of the cases do either of these things.  As a result, they are not direct authority for interpreting "legal certainty" to mean a heightened standard of proof applies to the elements of causation and damages in a "settle and sue" legal malpractice action.

Besides *Filbin*, Attorney describes a line of cases including *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037 (*Ferguson*); *Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489 (*Shopoff*); *Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518; *Barnard v. Langer* (2003) 109 Cal.App.4th 1453 (*Barnard*); *Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052; *Marshak v. Ballesteros* (1999) 72 Cal.App.4th 1514; and *Thompson v. Halvonik* (1995) 36 Cal.App.4th 657.

Only *Ferguson*, a Supreme Court case, mentions Evidence Code section 115.  To support its decision that lost punitive damages could not be recovered in a legal malpractice action, the court stated, "the complex standard of proof applicable to claims for lost punitive damages militates against the recovery of such damages."  (*Ferguson*, *supra*, 30 Cal.4th at p. 1049.)  The court acknowledged "the standards of proof governing compensatory and punitive damages are different" and compared the preponderance of the evidence standard in Evidence Code section 115 with the clear and convincing evidence standard in Civil Code section 3294, subdivision (a).  (*Ferguson*, *supra*, at p. 1049.)  The court then stated:  "To recover lost punitive damages, a plaintiff must prove *by a preponderance of the evidence* that but for attorney negligence the jury would have found *clear and convincing evidence* of oppression, fraud or malice."  (*Ibid*.)  In this statement, the court used the preponderance of the evidence standard to describe the level of proof applicable to "but for" causation.

We concur in Professor Johnson's interpretation of *Ferguson*, which states "there is no indication in *Ferguson* that the court sought to embrace a standard of proof [for causation and compensatory damages] other than the preponderance of the evidence rule.

Indeed, one of the rationales offered by the court in support of its holding that 'lost punitive damages' are not recoverable clearly recognized that recovery of compensatory damages in legal malpractice cases is governed by the preponderance of the evidence standard." (Johnson, *Causation and "Legal Certainty" in Legal Malpractice Law*, *supra*, 8 St. Mary's J. Legal Mal. & Ethics at p. 396.) Thus, the references in *Ferguson* to " 'a legal certainty' " and "any legal certainty" (*Ferguson*, *supra,* 30 Cal.4th at pp. 1048, 1049) do not support the use of a higher burden of proof for the elements of causation and compensatory damages in legal malpractice actions. Instead, those references show the requisite "legal certainty" is established by proving the elements by a preponderance of the evidence.

The only case in the line of cases described by Attorney that uses the phrase "more likely than not" is *Shopoff*, *supra*, 167 Cal.App.4th 1489:

> "The trial court found that [the client's] allegations of proximately caused damages were either inadequate, uncertain or speculative, and we agree. 'If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort.' (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200.) 'To show damages proximately caused by the breach, the plaintiff must allege facts establishing that, "but for the alleged malpractice, it is more likely than not the plaintiff would have obtained a more favorable result." [Citations.]' (*Charnay v. Cobert* [(2006)] 145 Cal.App.4th 170, 179, italics omitted.)" (*Shopoff*, *supra*, 167 Cal.App.4th at p. 1509.)

Subsequently, the court used the term "legal certainty" in discussing the distinction between an actual loss and a contingent loss. (*Shopoff*, *supra*, 167 Cal.App.4th at p. 1511.) The court stated that where the propriety of the attorney's advice is contingent on the outcome of a claim, no actual injury is sustained until the claim is resolved adversely to the client. (*Ibid*.) The court stated: "Even the 'mere probability' that a certain event would have happened will not furnish the foundation for malpractice damages. ' " 'Damages to be subject to a proper award must be such as follows the act complained of as a legal certainty.' " [Citations.]' (*Barnard v. Langer*

27.

(2003) 109 Cal.App.4th 1453, 1461–1462, italics omitted.)" (*Shopoff*, *supra*, 167 Cal.App.4th at p. 1511.)  Reading the opinion as a whole, we conclude *Shopoff*'s reference to "legal certainty" means the certainty established under the preponderance of the evidence standard.  (See generally, CACI No. 200 [proving a fact "is more likely to be true than not true"].)

None of the other cases in the line of cases referred to by Attorney mentioned Evidence Code 115, used the word "preponderance," or used the phrase "more likely than not."  Furthermore, none of the cases (1) recognized the general rule and exception in Evidence Code section 115 and (2) explicitly undertook the analysis usually employed when considering whether to alter the burden of proof from the preponderance of the evidence standard.  As a result, none of the cases explicitly state the appropriate burden of proof is the "legal certainty" standard *and* explain how that standard fits within the framework of the three common standards of proof listed in Evidence Code sections 115 and 502.  These omissions lead us to conclude the cases using the term "legal certainty" are not authority applying a heightened burden of proof to the elements of causation and damages in a legal malpractice action.  (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134 [cases are not authority for propositions not considered or decided].)  Consequently, we conclude the ambiguous term "legal certainty" simply means the level of certainty required by law, which is established by the applicable standard of proof.

D.     Preponderance of the Evidence Standard

As explained below, we conclude the applicable standard of proof for the elements of causation and damages in a "settle and sue" legal malpractice action is the preponderance of the evidence standard.  First, use of the preponderance of the evidence standard of proof is appropriate because it is the "default standard of proof in civil cases" (*Conservatorship of Wendland*, *supra*, 26 Cal.4th at p. 546) and use of a higher standard of proof "occurs only when interests ' "more substantial than mere loss of money' " are at

stake." (*Ettefagh*, *supra*, 150 Cal.App.4th at p. 1590.) Wife's legal malpractice action involves a claim to recover money as compensation for damages suffered. The parties have equal interests at stake because every dollar Wife recovers is a dollar Attorney must pay. In such situations, the risk of error usually is allocated more or less equally between the parties by applying the preponderance of the evidence standard of proof. (*Id*. at p. 1589.) In other words, when the dispute is over money, there rarely are compelling policy grounds for preferring one side's interests over the other. (*Ibid*.)

Second, our conclusion that the preponderance of the evidence standard is the proper standard for "settle and sue" malpractice actions is supported by dicta in *Viner, supra,* 30 Cal.4th 1232. There, the California Supreme Court concluded that a client alleging legal malpractice occurred in the performance of transactional work must prove the "causation element according to the 'but for' test, meaning that the harm or loss would not have occurred without the attorney's malpractice." (*Id*. at p. 1235.) The court compared this conclusion about transactional work with litigation work, stating:

> "In a litigation malpractice action, the plaintiff must establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred. The purpose of this requirement, which has been in use for more than 120 years, is to safeguard against speculative and conjectural claims. [Citation.] It serves the essential purpose of ensuring that damages awarded for the attorney's malpractice actually have been caused by the malpractice." (*Viner*, *supra*, 30 Cal.4th at p. 1241.)

This statement's reference to a more favorable judgment or settlement is broad enough to include the "settle and sue" malpractice action brought by Wife against Attorney. The Supreme Court made a further reference to the causation test for *litigation* malpractice and mentioned the applicable burden of proof: "For the reasons given above, we conclude that, just as in litigation malpractice actions, a plaintiff in a transactional malpractice action must show that *but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result." (*Viner, supra,* 30

29.

Cal.4th at p. 1244.) Requiring proof that something is "more likely than not" is a preponderance of the evidence standard. (*People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1305, fn. 28.)

Our Supreme Court's dicta are "highly persuasive," and we will generally follow it unless there is a compelling reason not to do so. (*Evans v. City of Bakersfield* (1994) 22 Cal.App.4th 321, 328.) Appellant has not identified a compelling reason for rejecting our Supreme Court's statements about the standards for establishing causation in a litigation malpractice action, which statements encompassed cases alleging an inadequate settlement.

Third, part III of Professor Johnson's article provides a lengthy discussion of the cases cited by Attorney. (Johnson, *Causation and "Legal Certainty" in Legal Malpractice Law*, *supra*, 8 St. Mary's J. Legal Mal. & Ethics at pp. 387–397.) Based on his review of California case law, Professor Johnson concluded the principle that causation of damages in a legal malpractice action must be proven with "legal certainty" is ambiguous and described two alternate interpretations:

> "If this means simply that factual and proximate causation of damages must be proved by the plaintiff by a preponderance of the evidence, there is nothing exceptional about what this line of California cases asserts. If, however, legal certainty imposes a more demanding burden of proof than the preponderance of the evidence standard, then these California cases reflect a dubious departure from principle widely accepted in American law, and a serious threat to the fairness of legal malpractice litigation." (*Id.* at pp. 377–379, fns. omitted.)

Professor Johnson concluded that establishing damages in a legal malpractice action by a preponderance of the evidence "is likely to strike a fair balance between the interests of plaintiffs and defendants, not to mention the interests of the legal profession and the public at large." (Johnson, *Causation and "Legal Certainty" in Legal Malpractice Law*, *supra*, 8 St. Mary's J. Legal Mal. & Ethics at p. 405.) His analysis of the policy considerations for using this standard of proof is set forth in part IV of the

article and is not repeated here. (*Id.* at pp. 397-402.) In closing his article, Professor Johnson urges California courts to "abandon the misleading language of legal certainty and speak plainly about the need of legal malpractice plaintiffs to prove causation of damages by a more likely than not preponderance of the evidence showing." (*Id.* at p. 405.) The present case is an object lesson for how the ambiguous term "legal certainty" hinders a clear understanding of the burden of proof and wastes resources of the litigants and judicial system.

In summary, we conclude the applicable standard of proof for the elements of causation and damages in a "settle and sue" legal malpractice action is the preponderance of the evidence standard set forth in Evidence Code section 115. A higher standard of proof is not "otherwise provided by" the judicial decisions relied upon by Attorney. (Evid. Code, § 115.) Accordingly, we reject Attorney's argument that a higher burden of proof in "settle and sue" legal malpractices cases is an uncontroverted legal principle that must be applied in this case.

II.     POSTTRIAL MOTIONS*

     A.     <u>Basic Principles</u>

        *1.     Motion for Judgment Notwithstanding the Verdict*

"The court … either of its own motion … or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict … should have been granted had a previous motion been made." (Code Civ. Proc., § 629, subd. (a).) When considering a motion for judgment notwithstanding the verdict, the trial court cannot weigh the evidence or judge the credibility of witnesses. (*Hauter*, *supra*, 14 Cal.3d at p. 110.) If the evidence is conflicting or if several reasonable inferences may be drawn, a court should deny the motion for judgment notwithstanding the verdict. (*Ibid.*) " 'A

---

*     See footnote, *ante*, page 1.

motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" (*Ibid.*) Every legitimate inference may be drawn from the evidence to support the verdict. (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750 (*Fountain Valley*).)

### 2. Standard of Appellate Review

The moving party may appeal from an order denying a motion for judgment notwithstanding the verdict. (Code Civ. Proc., § 904.1, subd. (a)(4).) As in the trial court, the standard of review on appeal is whether any substantial evidence, contradicted or uncontradicted, supports the jury's conclusion. (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the [verdict], and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429; *Montebello Rose Co. v. Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 21 (*Montebello*).)

Evidence is "substantial" for purposes of this standard of review if it is of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935–936; *Estate of Teed* (1952) 112 Cal.App.2d 638, 644.) Stated another way, substantial evidence is relevant evidence that a reasonable

mind might accept as adequate to support a conclusion on a question of fact. (*Inzana v. Turlock Irrigation Dist. Bd. of Directors* (2019) 35 Cal.App.5th 429, 441, fn.7.) Generally, whether the record contains substantial evidence to support the findings of the trier of fact is a question of law. (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1515–1516.) As a question of law, it is subject to our independent review.

### 3. New Trial

Code of Civil Procedure section 657 authorizes trial courts to grant a motion for new trial on several listed grounds, including the "[i]nsufficiency of the evidence to justify the verdict," the verdict "is against law," or an "[e]rror in law, occurring at the trial and excepted to by the party" applying for a new trial. (Code Civ. Proc., § 657, subd. 6 & 7.) When reviewing a trial court's denial of a motion for new trial, our review of the sufficiency of the evidence begins and end with "whether there is any substantial evidence, contradicted or uncontradicted, which will support the jury's verdict." (*Locksley v. Ungureanu* (1986) 178 Cal.App.3d 457, 463.) Thus, as to the sufficiency of the evidence, denials of motions for judgment notwithstanding the verdict and motions for new trial present appellate courts with the same question—was the verdict supported by substantial evidence.

### B. Expert Opinion

Before addressing the sufficiency of the evidence, which is relevant to both of Attorney's motions, we consider an argument about evidentiary error raised in her motion for new trial. Attorney contends the trial court abused its discretion in allowing Sodhi to testify that Wife could have obtained more than $1.2 million by going to trial. Attorney argues that Sodhi's opinion lacked foundation, was speculative, and was irrelevant. Attorney contends she is entitled to a new trial where such evidence would not be allowed.

### 1. Trial Court's Decision

The trial court's written ruling on the motion for new trial discussed the causation instruction, concluded the jury was properly given a "but for" instruction, and then addressed what it considered the other major issue raised by the motion for new trial—namely, the competency and sufficiency of the testimony of Sodhi, an attorney who testified as an expert, to sustain the verdict. First, the court stated it had reviewed Sodhi's testimony and found Sodhi "possessed sufficient qualifications and expertise to express the opinions contained in his testimony."

Second, the court considered the argument that Sodhi's expert testimony impermissibly invaded the jury's function as the finder of fact. The court considered Attorney's citation of *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953 (*Piscitelli*) and stated:

> "In that legal malpractice case, the plaintiff put on an expert witness to testify concerning an arbitration that Plaintiff contended Defendant's actions prevented him from pursuing. The Court stated: 'Under this format, it was precisely the jury's role to step into the shoes of the arbitrators, consider the facts of Piscitelli's underlying claims and ultimately determine their merits. Here, however, the court improperly shifted the jury's responsibility to decide the issue by permitting Piscitelli's expert to, in essence, testify that arbitrators *would* have granted Piscitelli monetary relief and cleared his [broker registration record] had the matter been presented to them. To entrust that ultimate determination to an expert, i.e., to allow the expert to reach the ultimate question of whether Piscitelli's underlying arbitration would have been successful, invades the jury's function.' [Citations.]" (Italics added.)

> "However, in this case Mr. Sodhi's testimony did not attempt to state what Judge Jacobsen *would* have decided. Instead, the testimony was: 'Q: Do you believe it would have been a reasonable outcome, given the facts of the case, that [Wife] could have been awarded at trial 1.5 million? The answer (after objections were made and overruled) : 'I think [Attorney] *could* have gotten more money if she tried the case. Q. Is the reasonable amount she would have obtained 1.5 million? A. I think that's the low end of what *could* have been obtained.' … [¶] Such testimony, in the view of the Court, does not invade the province of the jury." (Italics added.)

34.

After concluding Attorney's motion for new trial was timely filed, the trial court denied the motion.

### 2. Qualifications

A threshold question is whether the trial court erred in determining Sodhi was qualified to testify as an expert. The qualification requirements set forth in Evidence Code section 720, subdivision (a): "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." Attorney's opening brief does not mention this statute or directly challenge the trial court's qualification determination, but refers to Sodhi as a "so-called expert." This ad hominem attack suggests that Sodhi was not qualified to testify as an expert. We conclude this suggestion is not persuasive and does not affirmatively demonstrate trial court error. "Trying to win an argument by calling your opponent names ... only shows the paucity of your own reasoning." (*Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417, 1430.) Accordingly, we uphold the trial court's determination that Sodhi was qualified to testify as an expert witness.

### 3. Relevance

Attorney's opening brief asserts "[t]he relevant issue is whether would Wife have <u>certainly</u> <u>obtained</u> more than $1.2 million in an equalization payment should she have … proceeded to trial." Attorney argues Sodhi's opinion was based on an incorrect legal theory. Specifically, Attorney's reply brief asserts "Sodhi's opinion does not rise to the dignity of substantial evidence nor is there any hint of 'legal certainty.' " In other words, Attorney contends Sodhi's testimony was based on an incorrect view of the law because Sodhi did not adopt Attorney's interpretation of the term "legal certainty" and testify as to whether that standard was met. Consequently, Attorney argues "Sodhi's opinion does not constitute substantial evidence of a legally certain better result."

We reject Attorney's relevance challenge to Sodhi's testimony because it is based on an erroneous view of the term "legal certainty" as used in legal malpractice cases. (See pt. I., *ante*.)  Under our interpretation of that term, opinion testimony need not be phrased in terms of legal certainty to be relevant to a legal malpractice cause of action— the elements of which need only be proven by a preponderance of the evidence.

### 4.        *Foundation*

The foundation for an expert's opinion is addressed in part by Evidence Code section 801, subdivision (b).  Under that provision, an expert's opinion may be based on matters "made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  (Evid. Code, § 801, subd. (b).)

During Sodhi's testimony, he stated that when his law firm took over the representation of Wife, as "would be routine, we asked for the entire file .…"  The memorandum of understanding signed by Attorney and Husband's attorney was not in the original file obtained by Sodhi from Attorney and he subsequently obtained a copy. Sodhi was asked if he looked at "the settlement agreement and the file overall to determine whether or not this was a good settlement for [Wife]."  He replied:

> "From what I reviewed and what I received, it seems that, if I recall correctly, the business was making approximately $1.8 million a year. There was a tremendous amount of assets involved. I don't specifically recall what they were.  But I think 1.2 seems low.  I would have thought at least one year's worth of business income would have been reasonable; potentially more.

> "But again, the information I had limited it to simply 1.8 was what the business was making.  There were certain real estate holdings that were included.  I believe Mr. Deller was the expert in that regard, and I would have gone with what he said.  And I believe his indication was the valuation was higher than the 1.2 that the settlement amounted to."

Viewing the evidence in the light most favorable to Wife, we conclude the trial court did not error when it determined Sodhi's review of the file provided a sufficient foundation for his opinion. In other words, the file maintained by Attorney and provided to Sodhi, when supplemented with the memorandum of understanding, is the type of material that reasonably may be relied upon by an expert in forming an opinion in a legal malpractice action.

### 5. *Speculation*

In arguing Sodhi's testimony was speculative, Attorney's opening brief refers to "the $1,500,000 Sodhi guessed could have been a reasonable outcome if Wife rejected her settlement demand and proceeded to trial." Attorney supports this argument by referring to a legal malpractice text, which was quoted in *Barnard, supra,* 109 Cal.App.4th at p. 1462, fn. 13:

> " 'Theoretically, any settlement could be challenged as inadequate, and the resolution is likely to require a trial.... [¶] ... [¶] A claim regarding an inadequate settlement often fails because it is inherently speculative. Negligence cannot be predicated on speculation that the attorney or another attorney could have secured a more advantageous settlement or the fortuitous event that a jury instead of a judge may have returned a higher award. A client, who was a plaintiff, must establish not only that concluding such a settlement fell outside the standard of care, but also what would have been a reasonable settlement and that such sums would have been agreed to and could have and would have been paid.' (4 Mallen, Legal Malpractice (5th ed. 2000) Error—Settlement, § 30.41, pp. 582–585 ...."

The last sentence in this quote does not address the alternate approach of proving damages based on going to trial instead of settling. The "trial-within-a-trial" method remains "the most effective" means for establishing whether damages were "actually *caused* by a professional's malfeasance." (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 834, original italics (*Mattco*).) That method "does not 'recreate what a particular judge or fact finder would have done. Rather, the jury's task is

to determine what a reasonable judge or fact finder would have done ....' [Citation.] Even though 'should' and 'would' are used interchangeably by the courts, the standard remains an *objective* one. The trier of facts determines what *should* have been, not what the result *would* have been, or could have been, or might have been, had the matter been before a *particular judge* or jury." (*Id.* at p. 840, original italics.) Thus, in a "settle and sue" legal malpractice action, the "jury must decide what a reasonable jury or court would have done if the underlying matter had been tried instead of settled." (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1582.)

As to proof of the amount of damages, we refer to the general principle that, "though the fact of damage must be clearly established, the amount need not be proved with the same degree of certainty, but may be left to reasonable approximation or inference. Any other rule would mean that sometimes a plaintiff who had suffered substantial damage would be wholly denied recovery because the particular items could not, for some reason, be precisely determined." (6 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 1718 [certainty of damages].) In other words, California "law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873; see *Gulf Ins. Co. v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2000) 79 Cal.App.4th 114, 136 [difficulty in proving damages "should not prevent a party injured by an attorney's malpractice from having his day in court"].)

Based on these principles about proving damages, we conclude that Sodhi's opinion testimony about a reasonable range of outcomes had the matter gone to trial was not inherently speculative. Accordingly, we turn to the more specific argument raised by Attorney about the speculative nature of Sodhi's testimony.

Attorney contends Sodhi's testimony was speculative because Sodhi failed to consider the issue of discounting the value of the minority business interests. During

38.

cross-examination, Sodhi was asked if it would surprise him to learn the marital estate's interests in the three businesses were fractional. Sodhi answered, "That would be surprising." Thus, Attorney contends Sodhi did not know about the fractionalized interests and did not consider the impact of that fact upon the valuation of those interests.

Sodhi's failure to delve into more detail is explained by his testimony that Deller was the expert with regards to the business and real estate holdings and that he, Sodhi, "would have gone with what [Deller] said." Thus, Attorney's claim about Sodhi's view of the value of the business and real estate holdings is the equivalent of arguing Deller's report was itself speculative. We disagree and conclude Deller's report was an adequate basis for Sodhi's view of the value of the assets. Therefore, Sodhi's failure to independently analyze the valuation of the business and real estate interests listed in Deller's report and, moreover, Sodhi's failure to apply a discount to the minority interests did not render his opinion speculative.

Furthermore, Attorney has not demonstrated the risk of a minority interest discount was significant in the circumstances of this case. Attorney's opening brief describes part of the evidence relating to the discount by stating that "Deller testified at trial that he had been involved in cases where the settlement had taken into consideration the potential of a discount for the minority interest." Attorney's description omits material evidence. (See *Pope*, *supra*, 229 Cal.App.4th at p. 1246 [party challenging verdict for lack of substantial evidence must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable; unless this is done, the error is deemed waived].) First, it does not include Deller's testimony that he personally had "not seen a Court accept those kinds of discounts." Second, it fails to include the question asked Deller about the testimony he intended to give if the case went to trial and, specifically, whether he was going to apply the 35 percent discount. In response, Deller stated: "I was not planning to apply it, but I knew that the issue was out there. That's why I—that's why I prepared the analyses, you know, comparing." Thus, Deller,

a certified public accountant who had served as a court's expert in 97 cases, excluded a minority discount based on his experience. Third, Attorney omits a description of her own e-mail in which she stated "Judge Jacobson has indicated he is no[t] inclined to a discount, but he may change his mind after hearing testimony from an expert on this issue because he has not had the opportunity to rule on this issue before." Viewing the record in the light most favorable to the prevailing party, we conclude Sodhi's reliance on Deller's valuation of the businesses and real estate and the resulting absence of a minority discount did not render Sodhi's testimony speculative.

To the extent Attorney's reply brief raises other specific arguments not raised in her opening brief, those arguments about the speculative nature of Sodhi's opinion are forfeited. " '[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

### 6. Ultimate Issue of Fact

In *Piscitelli*, *supra*, 87 Cal.App.4th 953, the defendant attorney "moved in limine to exclude expert testimony on the ultimate result of the underlying arbitration, arguing such testimony would improperly focus on what the NYSE arbitration panel would have done (as opposed to what it should have done) and also usurp the jury's function to decide what should have been the result of the arbitration." (*Id*. at p. 971.) The court denied the motion and plaintiff's expert "testified that 'Piscitelli would very likely have prevailed in getting both monetary relief as well as having his [broker registration record] improved had the [NYSE] arbitration gone to completion.' " (*Id*. at p 972.) The appellate court concluded the admission of the expert opinion on the ultimate result of the arbitration was an abuse of discretion and, along with a refusal to give appropriate jury instructions, was prejudicial. (*Id*. at pp. 972, 974.) In reaching this conclusion, the court

stated that "*Mattco* should not be read to permit experts to tell the jury what a reasonable trier of fact would have done." (*Id*. at p. 973.)

Here, Attorney contends the trial court abused its discretion by permitting Sodhi to give his opinion as to the ultimate issue of fact. Based on *Piscitelli*, Attorney contends Sodhi should not have been allowed "to opine as to the reasonable outcome in the underlying matter should it have proceeded to trial." Attorney argues: "The speculative testimony of Sodhi as to what would have happened should the underlying case have gone to trial clearly influenced the jury in reaching a decision based on a one-sided view of the case. Its admission was therefore an abuse of discretion, entitling Attorney to a new trial on all issues."

We agree with the trial court's determination that *Piscitelli* is distinguishable from this case. In *Piscitelli*, the expert testified as the likely outcome of an arbitration—that is, "what the NYSE arbitration panel would have done (as opposed to what it should have done) [which] usurp[ed] the jury's function to decide what should have been the result of the arbitration." (*Piscitelli, supra,* 87 Cal.App.4th at p. 971.) Here, Sodhi testified that Attorney could have gotten more than the settlement amount if she tried the case. Sodhi was asked, "Is the reasonable amount she would have obtained 1.5 million?" Sodhi did not identify a specific figure as *the* reasonable amount. Instead, he stated that he thought $1.5 million was "the low end of what could have been obtained." Thus, Sodhi did not testify about a specific outcome by a particular tribunal or judge. As a result, his testimony did not "improperly focus on what the [particular tribunal or judge] would have done." (*Id.* at p. 971.) Also, by referring to a range of reasonable outcomes, Sodhi's testimony left it to the jury to (1) determine the amount Wife should have been awarded if the matter had gone to trial and (2) use that figure to calculate the ultimate issue—the amount of Wife's damages.

Because Sodhi's testimony avoided the error of stating what a *particular factfinder* would have done, we next consider whether his testimony complies with the

statement in *Piscitelli* that "*Mattco* should not be read to permit experts to tell the jury what a reasonable trier of fact would have done. Rather, *Mattco* simply sets out the objective standard the jury uses when deciding the underlying case—the jury must attempt to decide the case not as a particular judge or jury, but independently as the fact finder." (*Piscitelli*, *supra*, 87 Cal.App.4th at p. 973.) The court in *Piscitelli* explained these statements by quoting an Oregon case: " 'Although the issue is stated to be the probable outcome of the first case, the second jury is permitted to decide this by substituting its own judgment for that of the factfinder in the earlier case.' " (*Id*. at pp. 973–974.) Here, it appears Wife's counsel sought testimony that would have violated the principle that an expert should not tell the jury what a reasonable trier of fact would have done when he asked: "Is the reasonable amount she would have obtained 1.5 million?" Sodhi, however, deflected some of the specificity of this question by not adopting that particular amount but referring to a range with $1.5 million at "the low end of what could have been obtained." In any event, if we assume for purposes of this appeal that Sodhi's answer violated the principle stated in *Piscitelli* that an expert should not tell the jury what a reasonable trier of fact would have done, the next issue to be addressed—as it was in *Piscitelli*—is whether the inappropriate expert testimony was prejudicial.

### 7. Prejudice

California's constitutional doctrine of reversible error requires appellants to affirmatively demonstrate "the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Stated another way, the doctrine of reversible error "requires the appellant to establish prejudice." (*In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1051.)

In *Piscitelli*, the court concluded the "error in admitting the expert's testimony was prejudicial in view of the [trial] court's refusal to give instructions that would have permitted the jury to properly perform its function as the trier of the underlying

arbitration." (*Piscitelli*, *supra*, 87 Cal.App.4th at p. 974.) The court reached this conclusion after considering the totality of the circumstances. (*Id*. at p. 976.) These circumstances included the state of the evidence, the effect of the instructions and counsel's arguments, and any indication by the jury that it was misled. (*Ibid*.)

Here, Attorney's arguments about prejudice have not addressed the jury instructions and whether those instructions "permitted the jury to properly perform its function as the trier of the underlying [case]" (*Piscitelli*, *supra*, 87 Cal.App.4th at p. 974) or, alternatively, misled the jury into believing it was not responsible for independently deciding how the trial on the division of the marital estate should have been decided. Here, the trial court instructed the jury on the professional negligence cause of action by using CACI Nos. 600 (Professional Negligence, Standard of Care), 601 (Negligent Handling of Legal Matter), 602 (Success Not Required) and 603 (Alternative Legal Decisions and Strategies). These form instructions were introduced in 2003, after *Piscitelli* was decided. Thus, it appears the jury was properly instructed on the elements of the professional negligence cause of action.

Another factor relevant to determining prejudice is the effect of counsel's arguments. We note the final comment to the jury by counsel for Wife was that Attorney "is liable for this, and she should pay [Wife] the damages that you feel are necessary. Thank you." This comment did not encourage the jury to simply defer to Sodhi's opinion as to the range of reasonable outcomes. Instead, it implied the jury must independently decide the question of what the outcome of a trial should have been and then use that determination to calculate Wife's damages.

On balance, we conclude Attorney has not demonstrated prejudice from the admission of Sodhi's opinion testimony as to the range of reasonable outcomes of a trial on the division of the marital estate. Thus, the trial court did not abuse its discretion when it determined a new trial was not justified.

C.      Substantial Evidence

Attorney's motion for judgment notwithstanding the verdict and her motion for new trial challenge the sufficiency of the evidence to support the elements of causation and damages. Attorney's argument about insufficiency of the evidence was based in large part upon her view of the meaning of "legal certainty." Her loss of that argument has significantly undercut her claim that the evidence was insufficient to prove causation and damages. Wife's theory of causation and damages asserted that, but for Attorney's negligence, Wife would have gone to trial and recovered $1.5 million or more instead of the $1.2 million she received under the settlement. The jury agreed with this theory and awarded her $300,000 as total damages.

Deller's report presented two versions of the community's total assets less debts and reimbursements. The first version estimated the total at approximately $3.2 million. The second version estimated the total at approximately $3 million. If the total of $3 million is split equally between Husband and Wife, the Wife's total would be $1.5 million. During closing argument, Wife's counsel asserted, "Mr. Deller wasn't the only person who had an evaluation in this same range." Counsel showed the jury a slide of an evaluation prepared by Grimbleby, which had $1.253 million as the low, $1.579 million as the medium, and $1.639 million as the high.

As a court of review, our responsibility is not to resolve the conflicts between these reports and other evidence or to resolve the conflicts in the various inferences reasonably drawn from the report. (*Montebello*, *supra*, 119 Cal.App.3d at p. 21.) We conclude Deller's report and Grimbleby's evaluation were relevant evidence and a reasonable mind might accept it as adequate to support the conclusion that Wife's half of the community property was worth $1.5 million. The fact that they were contradicted by other evidence or that other inferences reasonably could be drawn from them is off point. Our power ends once we determine the report and evaluation constitute substantial evidence supporting the findings as to causation and damages. (*Ibid*.) Accordingly, we

44.

need not rebut Attorney's description of conflicting evidence or of other inferences that could reasonably be drawn from the report.

Based on the substantial evidence that supports the jury's findings on causation and damages, the trial court correctly rejected Attorney's challenges to the sufficiency of the evidence. Thus, Attorney's motion for judgment notwithstanding the verdict does not establish that she is entitled to the entry of judgment in her favor because Wife failed to prove her case. Similarly, Attorney has not established she is entitled to a new trial.

### D. Duplicative Claim for Breach of Fiduciary Duty

Attorney argues: "In the present case Wife's claim for breach of fiduciary duty fails as it was based on the same factual allegations as her legal malpractice claim and sought the very same damages." We agree that Wife sought the same damages under both legal theories. As a result, the jury's verdict on the professional negligence claim is sufficient to support the award of $300,000 in damages to Wife. Consequently, any purported error involving the breach of fiduciary duty would not be prejudicial. (*Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853-854 [prejudice is never presumed and must be affirmatively demonstrated by appellant]; see Cal. Const., art. VI, § 13 [no judgment shall be set aside unless the error complained of resulted in a miscarriage of justice].) In short, the award of $300,000 as damages for legal malpractice will stand whether or not there was error involving the breach of fiduciary duty cause of action.

### E. Public Policy of Promoting Settlements

Attorney's opening brief includes a section referring to California's strong public policy to promote settlement in Family Court. This section quotes Family Code section 271, subdivision (a) and states it provides family courts with the unique ability to sanction parties or attorneys who frustrate settlement. Attorney also mentions appellate decisions that have upheld an award of sanctions against parties who drive up the cost of

litigation and California Rules of Court, rule 5.98 that requires parties and attorneys to meet and confer before hearings in family law matters. Attorney closes the section by stating:

> "Thus, it would be absurd to find that an attorney breached the duty of loyalty to a client when they obtained a settlement of the matter for the exact amount which the client authorized the attorney to obtain. To permit such rule to stand would be placing a judicial imprimatur on requiring Family Law Attorneys to take every proceeding to trial and avoid settlement at all costs."

If Attorney's arguments about the public policy of promoting settlement was presented solely as support for her contentions challenging the breach of fiduciary duty cause of action, then we need not address them because the damages awarded are upheld under the professional negligence cause of action. Alternatively, Attorney's arguments may be an attempt to establish reversible error with respect to the legal malpractice cause of action. Consequently, we will address them.

In her reply brief, Attorney contends her consent to Wife's demand to settle for an equalization payment of $1.2 million was a protected judgment. Attorney argues, "Wife's contention that she was 'forced' into settlement is belied by her own testimony in which she stated she authorized [A]ttorney to settle the matter for $1.2 million." We reject this argument about Wife's own testimony because it does not view that testimony in the light most favorable to Wife, the prevailing party. Viewed in the light most favorable to Wife, she did not agree to a $1.2 million settlement until the morning trial was scheduled. By that time, Attorney's breach of the standard of care had occurred and was a substantial factor in Wife's decision to sign the marital settlement agreement. As a result, this argument about an authorized settlement does not affirmatively demonstrate prejudicial error. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

F.  Protected Professional Judgment

Attorney contends her efforts to settle involved an exercise of her professional judgment that is protected by public policy.  Attorney argues that attorneys are protected from claims of inadequate settlement so long as they exercised their informed judgment.  In Attorney's view of California law, Wife's legal malpractice claim fails because Wife did not present evidence of inaccurate appraisals or defects in Deller's opinion.  In her reply brief, Attorney goes so far as to claim that it was she who consented to Wife's demand to settle for an equalization payment of $1.2 million.

This argument requires little discussion.  The trial court used CACI No. 602 to instruct the jury that an attorney is not necessarily negligent just because her efforts are unsuccessful, or she makes an error that was reasonable under the circumstances.  In addition, the trial court used CACI No. 603 to instruct the jury that an attorney is not necessarily negligent just because she chooses one legal strategy or makes a recommendation and it turns out that another strategy or recommendation would have been a better choice.  Despite these instructions, the jury still found Attorney was negligent.  The jury's finding of negligence precludes us from accepting the argument that Attorney exercised an informed professional judgment in recommending Wife accept the marital settlement agreement.

**DISPOSITION**

The judgment is affirmed.  Wife shall recover her costs on appeal.


FRANSON, Acting P.J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

47.